IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

IN RE INTEREST OF BOSILEO D. ET AL.

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

IN RE INTEREST OF BOSILEO D. ET AL., CHILDREN UNDER 18 YEARS OF AGE.

STATE OF NEBRASKA, APPELLEE,
V.
CHRISTOPHER J., APPELLANT.

Filed June 17, 2025.    No. A-24-749.

Appeal from the Separate Juvenile Court of Douglas County: VERNON DANIELS, Judge. Affirmed.

Brian J. Muench for appellant.

Shinelle Pattavina, Deputy Douglas County Attorney, for appellee.

RIEDMANN, Chief Judge, and MOORE and ARTERBURN, Judges.

MOORE, Judge.

INTRODUCTION

Christopher J. appeals from an order of the separate juvenile court for Douglas County, terminating his parental rights to three of his children. Upon our de novo review of the record, we affirm the juvenile court's order.

STATEMENT OF FACTS

PROCEDURAL HISTORY

Christopher is the biological father of Kayol J., born in May 2009; Amelius J., born in August 2014; and Bosileo D., born in June 2017. The children were removed from Christopher's care in January 2021 due to allegations of Christopher's physical abuse of the children and his

- 1 -

substance use. The children's mother is not a part of this appeal and will be discussed only as necessary.

On January 26, 2021, the State filed a supplemental petition, alleging that the juvenile court had jurisdiction of the children because they came within the meaning of Neb. Rev. Stat. § 43-247(3)(a) (Reissue 2016). Specifically, the State alleged that the children lacked proper parental care due to the faults or habits of Christopher because Christopher had engaged in domestic violence in the presence of the children; subjected the children to inappropriate physical contact; used alcohol and/or controlled substances; failed to provide proper parental care, support, supervision, and/or protection; failed to provide the children with safe, stable, and independent housing; and put the children at risk of harm.

Following a 4-day adjudication hearing, the juvenile court entered an order on July 20, 2021, finding that the State had proven all counts of the supplemental petition by a preponderance of the evidence and adjudicating Kayol, Amelius, and Bosileo as juveniles within the meaning of § 43-247(3)(a). The juvenile court appears to have entered its dispositional order in August 2021, though the order's details are unclear from our record on appeal. Christopher appealed the adjudication order, which this court subsequently affirmed. See *In re Interest of Bosileo D. et al.*, No. A-21-627, 2022 WL 774657 (Neb. App. Mar. 15, 2022) (selected for posting to court website). The children have remained out of the home since they were removed.

A case plan presented by the Nebraska Department of Health and Human Services (the Department), dated July 2022, included four goals for Christopher: Christopher will develop and utilize problem solving and coping skills free of violence to ensure that his children are safe and protected; will abstain from all mind or mood altering substances; will provide for the children's physical, emotional, educational, and medical needs; and will provide safe and stable housing for himself and his children. A case plan dated April 2024 references that several review hearings were held during the case, occurring on February 13, 2023; July 11; and October 23. Our record includes the bill of exceptions from a review hearing held on April 24, 2024. The goals of the Department case plans have been consistent throughout the case.

On September 27, 2023, the State filed a motion for termination of the mother's parental rights. That same day, the State filed a second motion to terminate Christopher's parental rights, alleging statutory grounds to terminate Christopher's rights existed pursuant to Neb. Rev. Stat. § 43-292(2), (6), (7), and (9) (Reissue 2016). The State also alleged that termination of Christopher's parental rights was in the children's best interests.

TRIAL

Helena Clay-Veitch, the initial assessment worker who investigated the family, received an intake regarding the safety of the children in Christopher's home in January 2021. The intake report stated that the children were presently staying in their maternal grandmother's home and Clay-Veitch had contact with the children there.

As part of her assessment, Clay-Veitch spoke with Christopher over the phone on January 21. She expressed to Christopher that after interviewing the children, she had identified several safety concerns and would like to speak with him further. At that time, a large snowstorm was forecasted and Clay-Veitch asked Christopher if the children could continue to stay with their grandmother to ensure their safety until the Department could assess further. On the phone,

Christopher screamed at Clay-Veitch, cried, and was "incoherent" during points of their conversation. Christopher needed to be redirected several times and kept repeating that he could not believe that "his children would do him like that." Christopher also repeatedly called his children "liars."

After the snow cleared, Clay-Veitch continued her assessment and contacted Christopher to offer several public places for a meeting. Clay-Veitch was unwilling to meet Christopher at his home because the children had expressed concern for anyone's safety in the home, including their own. The children described significant violence directed toward themselves and Christopher's girlfriend at the time. The children also advised Clay-Veitch that Christopher had an unsecured gun in the home. Clay-Veitch spoke with the family's caseworker from a previous juvenile case who shared similar concerns about visiting the house alone. Ultimately, Clay-Veitch did not meet with Christopher in January 2021, but had other contacts with him over the phone and after court hearings in the following months.

Clay-Veitch supervised a video visit between Christopher and the children in February of 2021. During the visit, Christopher ignored Clay-Veitch's instructions not to speak about the juvenile case. He repeatedly referred to the children staying at their grandmother's home as "a vacation." Clay-Veitch observed the interaction to be visibly distressing to the children. She observed that Christopher talked about himself during the entire visit and did not ask the children any questions about themselves.

Alycia Carlston, the family's case worker from July 2021 to December 2023, testified that she was aware that the family had been involved in a previous juvenile case. The juvenile court noted for the record that "there is a filing by the State under 43-292 Subdivision (2)." A report by the children's guardian ad litem, dated April 17, 2024, and entered into evidence at the April 2024 review hearing, stated:

> The three . . . kids were previously under the juvenile court jurisdiction since June 2016 to August 2020 due to domestic violence in the home. Kayol [J.] attended family therapy with his previous therapist, Ann Holmstrom, and his father Christopher [J.] [Christopher] also worked with CPP therapist Betty Kola and his two younger children, Bosileo [D.] and Amelius [J.] These three children did not disclose any physical abuse throughout the previous case and the focus was on communication and parenting skills. The children did reunify with their father in August 2020 and were removed from their father's custody due to allegations of physical abuse in [January] 2021 and adjudicated in July 2021.

Carlston testified that in the present juvenile case, while his appeal of the adjudication order was pending, he was only ordered to participate in visitation with the children. Initially, the visitation occurred virtually through video visits. Though Christopher did his best to engage with the children, Carlston noted that they were relatively young at the time and therefore did not want to sit still and talk over video.

According to Carlston, the reason for the video visitation was because the children had refused to meet with Christopher in person. The children reported to Carlston that they were afraid of Christopher. Carlston had a conversation with Christopher about the alleged physical violence that had led to the children's removal as well as the children's fear of Christopher. Christopher told Carlston that the children had fabricated their disclosures of physical violence and that the

reason they were not attending in-person visits was because they were being influenced by their grandmother, who has been their placement for the entirety of the juvenile case. Carlston also noted that Christopher had asked multiple times throughout the case for the children to be removed from the grandmother's home, believing that in the previous juvenile case she had not been supportive of the children's reunification with Christopher. Carlston had observed the grandmother to be encouraging of the children attending visits with Christopher.

Carlston spoke with the children and told them that a visitation worker would be there to supervise the visit, and if the children felt uncomfortable at any time, they could let the worker know. In September 2021, the children agreed to in-person visitation with Christopher. Carlston stated that these visits generally went well and occurred at engaging locations such as a trampoline park or an arcade.

The in-person visitations lasted once a week until January 2022, when on a visit, Christopher and Kayol had a verbal disagreement. Christopher apparently told Kayol that if he did not want to be at the visit, he could leave. When the visitation worker took the children back to their placement to drop Kayol off, the other two children refused to go back to the visit with Christopher. After that incident the Department attempted to reinstate virtual visitation for the family, which Carlston described as "very sporadic." Christopher would attempt to engage in the virtual visits, but the children would typically state that they did not want to attend.

Carlston testified that in August 2022, the juvenile court suspended visitation until Christopher completed a psychological evaluation with a parenting assessment. Christopher was willing to complete the evaluation and asked to be put on as many waiting lists as possible in order to expedite being paired with a provider. After significant delay caused by long provider wait lists and one provider having issues processing payment through both the Department and Christopher's Medicaid, Dr. Theodore DeLaet agreed to schedule an evaluation with Christopher for early May 2023.

DeLaet, a licensed psychologist, testified that he did not fully complete the evaluation for Christopher. After 30 minutes with Christopher, DeLaet was unable to win Christopher's trust and cooperation. At the time, Christopher refused to sign a full release of the evaluation for the Department and only agreed to sign a release to his attorney. DeLaet testified that Christopher exhibited "some tenseness, as well as agitation and frustration." However, Christopher's tenseness was different than the type of situational anxiety DeLaet typically sees of other parents undergoing an evaluation. Out of about 150 psychological examinations completed in the last year, DeLaet's experience with Christopher was one of only two instances where he was unable to establish rapport. Due to Christopher's lack of trust, DeLaet ended the assessment process and told Christopher that it would be better if he found a different provider whom he could trust.

Carlston arranged for another evaluation provider and Christopher was seen in June 2023. When the evaluation results were ready a few months after the appointment, Carlston was informed that Christopher had not signed a release of information for the Department. Carlston discussed this with Christopher, who then provided a release, and Carlston received the evaluation results in October.

After Carlston received the results of Christopher's evaluation, she did not immediately recommend that Christopher begin visitation with the children again. The evaluation recommended family therapy provided by one of the children's therapists, in which Christopher

indicated to Carlston he was willing to participate. Carlston spoke with the children's therapists, who did not feel as though the children were ready to resume visitation with Christopher. According to Carlston, the children's therapists sent recommendation letters stating, "what they would like to see done prior to family therapy being able to begin." These recommendation letters were apparently provided to the juvenile court, but do not appear in our record on appeal.

The specific recommendations of the children's therapists, as summarized by Carlston's testimony and the guardian ad litem report, included: Christopher engage in his own individual therapy regularly with a therapist who specializes in trauma in order to understand how the father's behavior has impacted his relationship with the child and child's trauma; Christopher sign a release of information for therapists in order to collaborate with the father's therapist; Christopher take responsibility for the abuse witnessed and/or experienced while in his care; and the children's respective therapists consider the child's readiness to meet with the father to determine if family therapy can be utilized.

Carlston did not make a referral for family therapy. By the time she had received the recommendations from the children's therapists, she did not have the time to review the recommendations with Christopher before a new caseworker took over the family's case in December 2023. At the time Carlston left the case, she did not feel that Christopher was in a place to begin visitation "due to the therapists' recommendations from what things the children had said." Carlston likewise never shared the recommendations of the children's therapists with Christopher. Carlston testified that visitation between Christopher and the children had not resumed following their suspension by court order.

Carlston testified that Christopher was cooperative in working with her and followed his case plan, but had never taken any accountability or responsibility for the reason the children were removed. Throughout the life of the case Christopher continued to believe that the children had lied about their experience of physical abuse. According to Carlston, Christopher neglected the emotional well-being of his children due to his lack of acknowledgment regarding the circumstances of the juvenile case.

ORDER

Following the termination trial, the juvenile court entered an order on September 9, 2024, terminating Christopher's rights to Kayol, Amelius, and Bosileo. The court found the testimonies of Katie Millard, James Smith, Lindsey Hunter, Carlston, DeLaet, Clay-Veitch, Trinity Cox, and Holly King, to be individually reliable, credible, probative and entitled to weight. The court found that the State had met its burden of proving grounds for termination under § 43-292(2), (6), (7), and (9). The court further found that it was in the best interests of the children to have Christopher's parental rights terminated.

APPEAL

On October 7, 2024, Christopher filed his notice of appeal and requested the bill of exceptions and transcripts in the juvenile case. In his request for the bill of exceptions, he requested "[a]ny and all testimony, exhibits, and arguments offered or received" from the hearings held on April 24, July 22, July 23, and July 26. The April 24 hearing was a review and permanency planning hearing. The termination hearing began on July 22 and continued on July 23. At the

conclusion of the day on July 23, the court stated that the hearing would continue on July 25. According to the record, the hearing on the motions for termination (of both mother and father) concluded on July 25, and the parties were ordered to submit written closing arguments. Christopher's praecipe requesting a bill from July 26 was apparently an error. The official court reporter for the separate juvenile court of Douglas County filed a certification stating no bill of exceptions could be produced related to July 26.

Christopher filed an amended request for a bill of exceptions on December 17, 2024. This request sought a bill from additional hearings on March 19 and 25, and it corrected the date of the last termination hearing to July 25. However, because there was no motion filed for leave to file a supplemental bill of exceptions, and no leave granted for a supplemental bill of exceptions, we ordered that no further bill of exceptions shall be prepared by the court reporter beyond that requested in the original praecipe. See Neb. Ct. R. App. P. § 2-105(B)(2)(f). Christopher did not thereafter file a motion for leave to file a supplemental bill of exceptions seeking to correct the date of the last hearing from July 26 to July 25.

ASSIGNMENT OF ERROR

Christopher assigns that the juvenile court erred by finding that the termination of his parental rights was in the children's best interests.

STANDARD OF REVIEW

An appellate court reviews juvenile cases de novo on the record and reaches its conclusions independently of the findings made by the juvenile court below. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). However, when the evidence is in conflict, an appellate court may consider and give weight to the fact that the juvenile court observed the witnesses and accepted one version of the facts over another. *Id.*

ANALYSIS

STATUTORY GROUNDS FOR TERMINATION

The juvenile court found that the State had presented clear and convincing evidence to satisfy § 42-292(2), (6), (7), and (9). Christopher does not challenge the juvenile court's finding that statutory grounds to terminate have been met. However, for the sake of completeness, we address this requirement for termination of parental rights.

Section 43-292(7) allows for termination when "[t]he juvenile has been in an out-of-home placement for fifteen or more months of the most recent twenty-two months." Section 43-292(7) operates mechanically and, unlike the other subsections of the statute, does not require the State to adduce evidence of any specific fault on the part of a parent. *In re Interest of Mateo L. et al.*, 309 Neb. 565, 961 N.W.2d 516 (2021).

Here, the children have been in out-of-home placement for 15 or more months of the most recent 22 months. The children were removed from Christopher's care on January 26, 2021, and have remained out of the home since their removal. The State filed the motion for termination of parental rights on September 27, 2023. The existence of the statutory basis alleged § 43-292(7) should be determined as of the date the petition or motion to terminate is filed. See *In re Interest of Jessalina M.*, 315 Neb. 535, 997 N.W.2d 778 (2023). At the time of filing, the children had been

in out-of-home placement for 32 months. Thus, the statutory requirement for termination under § 43-292(7) has been met.

If an appellate court determines that the lower court correctly found that termination of parental rights is appropriate under one of the statutory grounds set forth in § 43-292, the appellate court need not further address the sufficiency of the evidence to support termination under any other statutory ground. *In re Interest of Becka P. et al.*, 27 Neb. App. 489, 933 N.W.2d 873 (2019). Because the State presented clear and convincing evidence that the children had been in an out-of-home placement for 15 or more months of the most recent 22 months, statutory grounds for termination of Christopher's parental rights exist.

PARENTAL UNFITNESS AND BEST INTERESTS

In addition to providing a statutory ground, the State must show that termination of parental rights is in the best interests of the child. *In re Interest of Gabriel B.*, 31 Neb. App. 21, 976 N.W.2d 206 (2022). In light of the constitutionally protected nature of the parent-child relationship, there is a rebuttable presumption that it is in the child's best interests to share a relationship with his or her parents. *In re Interest of Denzel D.*, 314 Neb. 631, 992 N.W.2d 471 (2023). The presumption that it is in the child's best interests to share a relationship with his or her parent can only be overcome by a showing that the parent either is unfit to perform the duties imposed by the relationship or has forfeited that right. *Id*. Parental unfitness means a personal deficiency or incapacity that has prevented, or will probably prevent, performance of a reasonable parental obligation in child rearing and that has caused, or probably will result in, detriment to a child's well-being. *Id*.

The best interests analysis and the parental fitness analysis are fact-intensive inquiries. *In re Interest of Jahon S.*, 291 Neb. 97, 864 N.W.2d 228 (2015). While both are separate inquiries, each examines essentially the same underlying facts. *Id*. In proceedings to terminate parental rights, the law does not require perfection of a parent; instead, courts should look for the parent's continued improvement in parenting skills and a beneficial relationship between parent and child. *In re Interest of Becka P. et al., supra*.

Christopher argues that he was never afforded a reasonable or realistic chance to reunify with his children because the juvenile court improperly delegated the issue of parent-child contact to the children's individual therapists. Additionally, Christopher asserts that the State failed to prove that he was an unfit parent, because he was in compliance with his case plan, and because he was restricted from demonstrating whether he could properly parent due to a lack of visitation.

Though the juvenile court's termination order referenced eight witnesses (including the children's therapists, the family's visitation worker, and most recent caseworker), our bill of exceptions includes only trial testimony from Clay-Veitch, DeLaet, and Carlston. A review of this testimony, however, clearly and convincingly established that termination of Christopher's parental rights was in the best interests of the children.

Testimony at trial established that at the time of the children's removal in January 2021, they were afraid of Christopher. The children had only recently been returned to Christopher after being reunified with him in a previous juvenile case. The children reported to Clay-Veitch that they had been physically abused in Christopher's home and expressed concern about Clay-Veitch going to Christopher's home alone. The children initially refused to attend in-person visits with

Christopher and reported to Carlston that it was because they feared him. The children finally agreed to supervised in-person visits nearly 8 months after their removal. Though testimony from the children's therapists does not appear in our record, Carlston testified that in October 2023, the children's therapists did not believe the children were ready to resume visitation with Christopher. This was over 1 year after visitation had apparently been suspended by the juvenile court.

Carlston also testified that a significant barrier to case progress was Christopher's failure to accept responsibility for the physical abuse that had led to the children's removal. Christopher called his children liars to both Clay-Veitch and Carlston. Carlston believed that Christopher neglected the emotional well-being of his children due to his lack of acknowledgment. One of the recommendations of the children's therapists was that Christopher take responsibility for the abuse witnessed and/or experienced by the children while in his care. The completion of this recommendation was a prerequisite to family therapy. Our record does not show that Christopher accepted responsibility following Carlston's time as the family's caseworker.

Where a parent is unable or unwilling to rehabilitate himself or herself within a reasonable time, the best interests of the child require termination of the parental rights. *In re Interest of Zanaya W. et al.*, 291 Neb. 20, 863 N.W.2d 803 (2015). Based on the evidence presented, there has been minimal change in Christopher's ability to be accountable to his children.

Further, Nebraska courts have recognized that children cannot, and should not, be suspended in foster care or be made to await uncertain parental maturity. See *In re Interest of Octavio B. et al.*, 290 Neb. 589, 861 N.W.2d 415 (2015). Kayol, Amelius, and Bosileo have been in foster care since January 2021. This removal occurred only 5 months after they had been reunified with Christopher following a previous juvenile case which lasted for 4 years. The children deserve stability and should not be suspended in foster care when Christopher is unable to rehabilitate himself. Accordingly, we find there was clear and convincing evidence to show that Christopher was unfit and that terminating his parental rights was in the children's best interests.

## CONCLUSION

We conclude the State proved by clear and convincing evidence that grounds for termination of Christopher's parental rights existed under § 43-292(7) and that termination of his parental rights is in the children's best interests. Accordingly, the juvenile court's order is affirmed.

AFFIRMED.